# OFFICE OF THE FEDERAL PUBLIC DEFENDER
## DISTRICT OF MARYLAND
### NORTHERN DIVISION
TOWER II, SUITE 1100
100 SOUTH CHARLES STREET
BALTIMORE, MARYLAND 21201-2705
TEL: (410) 962-3962
FAX: (410) 962-0872

2008 MAY -7 P 3: 52

JAMES WYDA
FEDERAL PUBLIC DEFENDER

DENISE C. BARRETT
ASSISTANT FEDERAL PUBLIC DEFENDER

**Hand-delivery**

May 7, 2008

**Crack Reduction**          **Updated Status Report**

The Honorable Catherine C. Blake
United States District Judge
United States Courthouse
101 W. Lombard Street
Chambers 7D
Baltimore, Maryland 21201

Re:    *United States v. Nathaniel Trader*
       No. WEB-93-0368

Dear Judge Blake:

Please accept and docket this letter as an updated status report in the above-captioned case. I have reviewed the sentencing transcript in this case. Mr. Trader is correct that the Court did not find that his offense involved "more than 15.84 kilograms of cocaine base" as reported in the presentence report and the recent report of U.S. Probation.

According to the sentencing transcript, relevant portion attached, it appears as if the Court found that Mr. Trader was responsible for 3 to 4 kilos of crack cocaine. The Court quite clearly rejected much of the claims of one of the cooperating witnesses that would have elevated the quantity. Exhibit A.

Under the amended guidelines, Mr. Trader's total offense level would be 38. At a criminal history I, OL 38, his new range would be 235 months to 293 months. At the original sentencing, the Court sentenced Mr. Trader to 274 months imprisonment. This sentence was based on the low end of a level 40, Criminal History I (292 to 365 months) with an 18 month credit for a state sentence on a related case. With a two level reduction under the amended guideline, Mr. Trader's sentence could reduce from 274 months to 217 months.

I have written Mr. Trader and asked whether he wants counsel appointed. Enclosed is a proposed order requiring an updated status report within sixty days.

The Honorable Catherine C. Blake
May 7, 2008
Page 2

Thank you for your attention to this matter.

Very truly yours

Denise C. Barrett
Assistant Federal Public Defender

DCB/kdw

Enclosures

cc:     Barbara Sale, AUSA
        Estelle Santana, USPO
        Court file
        Nathaniel Trader

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

1   UNITED STATES OF AMERICA,          *   Case No. B-93-0368
                                       *
2                  v.                  *
                                       *
3   NATHANIEL TRADER,                  *   101 W. Lombard Street
                                       *   Baltimore, MD  21201
4              Defendant.              *   February 10, 1995
                                       *   2:00 p.m.
5                                      *
                                       *
6   * * * * * * * * * * * * * * * * * * * * * * * * * * * *

7                 TRANSCRIPT OF SENTENCING HEARING
         BEFORE THE HONORABLE WALTER E. BLACK, JR.
8         UNITED STATES DISTRICT COURT SENIOR JUDGE

9   APPEARANCES:

10

11  For the Government:              CHRISTINE MANUELIAN, AUSA
                                     101 W. Lombard Street
12                                   Baltimore, MD  21201

13  For the Defendant:              WILLIAM MURPHY, ESQUIRE
                                     1007 N. Calvert Street
14                                   Baltimore, MD  21202

15

16  Audio Operator:                 K. MOYE

17  Transcription Service:          MONIQUE E. GIBSON
18                                   M.E.G. TYPING & TRANSCRIPTION

19

20

21  Proceedings recorded by electronic sound recording,
    transcript produced by transcription service.
22

23

24

25



M.E.G. Typing & Transcription
2743 Singer Woods Drive
Abingdon, MD 21009
(410) 515-7056

EXHIBIT A

3

```
 1              P R O C E E D I N G S

 2          (Call to order of the Court.)

 3              THE CLERK:  The United States District Court for

 4    the District of Maryland is now in session, the Honorable

 5    Walter E. Black, Junior presiding.

 6              THE COURT:  Good afternoon.

 7              ALL:  Good afternoon, Your Honor.

 8              THE COURT:  Ms. Manuelian, the government has a

 9    matter today.

10              MS. MANUELIAN:  Yes, Your Honor.  We're here for

11    sentencing in the United States versus Ned Trader, Case

12    Number B-93-0368.

13              THE COURT:  Yes.  It seems to me, counsel, the

14    first thing we need to address is the pending motion for a

15    new trial.  I really wanted to get that in front of me.

16              MR. MURPHY:  Your Honor, I'm ready to be heard.

17              THE COURT:  Yes.  Bear me with just a second

18    because I really ought to have it in front of me.

19              MR. MURPHY:  I have an extra copy.

20              THE COURT:  Well, I certainly had a copy.  Okay.

21    I found it.  Okay.  Go ahead, Mr. Murphy.

22              MR. MURPHY:  Judge, you're familiar with all of

23    these arguments because I made them during the trial.  And

24    so what we are essentially asking you to do is to reconsider

25    certain things that you did at the trial with the exception
```

57

1   me to retain the transcript of the testimony because at some

2   point that would become the appropriate part of the file in

3   any event.   I am uncertain about Mr. McKnight's presentence

4   investigation.   That probably was not an exhibit at the

5   trial.

6           MR. MURPHY:   No, but I'm offering it as a

7   sentencing exhibit.

8           THE COURT:   I was going to say I think it's

9   appropriate, Ms. Moye, to mark this as a hearing exhibit

10  today on behalf of the defendant so that it is part of the

11  record.

12          The Court is prepared now to go forward with the

13  sentencing proceeding.   If I may, Mr. Murphy, first let me

14  ask you, you have had the opportunity to review the

15  presentence report?

16          MR. MURPHY:   Yes, Your Honor.

17          THE COURT:   And has your client had the

18  opportunity to do so as well?

19          MR. MURPHY:   Yes, he has.

20          THE COURT:   And has he had a full opportunity to

21  discuss with you any aspect of that as to which he needed to

22  discuss with counsel?

23          MR. MURPHY:   Yes, he has.

24          THE COURT:   Okay.   Well, then as you know under

25  the order entered by the Court in criminal matters, the

1    findings of the probation officer adopted as the tentative

2    findings of this Court, and let me recite for the record

3    what they are.  The probation report shows a base offense

4    level of 38 based on amount, quantity, and to which has been

5    added four points for role in the offense, that this was a

6    conspiracy involving five or more participants or was

7    otherwise extensive, making a total offense level of 42.

8    The criminal history showed the one prior conviction with

9    three points which places it in Criminal History Category

10   Roman Numeral II.  So the first question I need to address

11   or have counsel address is objections to the findings of the

12   probation officer.

13            MR. MURPHY:  Your Honor, there are two objections,

14   and that is to the number of people in the conspiracy

15   because in order to reach that you have to credit all of Mr.

16   McKnight's and Mr. Keene's testimony because that's the only

17   place that stuff came from, and you would have to discredit

18   the testimony of Hook, and the probation agent wasn't in the

19   position to do that.  You are in a position to have

20   evaluated the testimony of Hook.

21            And, frankly, we don't know what the jury made of

22   that testimony because it isn't necessarily reflected in the

23   verdict.  But we do know, Judge, that the issue of whether

24   or not you are going to give these witnesses full

25   credibility under the test you have to apply by a

59

1  preponderance of the evidence or whether you will give them
2  part credibility or whether you will give them no
3  credibility is an individual judgment you have to make based
4  on your independent appraisal of their testimony during
5  trial.

6          And so I think we all can agree that it by no
7  means follows that because there's been a guilty verdict
8  that you are to assign any level of credibility at all to
9  these witnesses solely because of the jury's verdict.  This
10  is especially true since the verdict could have meant that
11  they thought -- that they rejected most of the testimony of
12  these two people except that they believed that Mr. Trader
13  was involved in a single act of conspiracy.  So both issues
14  as to the four point upward adjustment and the amount of
15  drugs are based on the same consideration.  To what extent
16  are you going to give credit or credibility to either of
17  these two guys?

18          Now, their testimony was about entirely separate
19  trips, and I have argued this point extensively.  I would
20  like the Court to focus counsel on any issues of particular
21  concern that you have about what to do because I think the
22  question raised by Ms. Manuelian is apropos to this case.
23  What if you find that their testimony is so uncertain as to
24  any particular incident?  If there was ever a case this is
25  it because how many lies do you have to tell before you are

1    a liar.

2         So if there was ever a case where you've got two

3    incredible people before you that the jury has chosen to

4    believe for whatever their reasons, how do you pick and

5    choose?  You know, you've got three choices.  Accept all of

6    it.  Well, that would be intellectually dishonest because

7    how can you do that?  I mean, how can you say that the guy

8    is telling the truth about a trip when he doesn't remember

9    whether it was in '89, '90, '91 or '92?  And if he's lied to

10   the police, lied to courts, lied under all kinds of

11   circumstances, what is but a leap of faith that he's telling

12   the truth here today?  If he lied about whether crack would

13   affect his memory and we know he told an altogether

14   different thing to the PSI reporter, you know, he was so

15   whacked out on crack he didn't remember whether he committed

16   the crime, so what are we supposed to do?

17         You know, if I had an adult in front of me whose

18   credibility I had to believe in so much that I had to look

19   to see whether he was credible on specific instances, I

20   think, Judge, it's clear these people are not the kind of

21   folk that you can trust.  And I don't think that's cured by

22   the fact that Mr. Keene had a plea agreement in Philadelphia

23   and could have been prosecuted if Ms. Manuelian reported to

24   Philadelphia that he committed perjury.  And when is the

25   last time you saw that?  And I don't think there was any

61

1  plea agreement that would ensure, as the government usually

2  argues, the reliability of Keene.  The government said Keene

3  didn't have a plea agreement.  So how do you decide this?

4  And I think that it would be rolling dice, throwing a dart

5  at a dart board, to do anything but arbitrarily assign any

6  level of weight to these people.

7       And, Judge, I think the reason that the courts --I

8  was in the Fourth Circuit last week and Judge Garbis was in

9  the same position you're in now concerning a narcotics case,

10  and he said, listen, maybe the jury for whatever reasons it

11  wanted to do so found some credibility in these witnesses,

12  but I'm not because there isn't an intellectually honest way

13  for me to say that these two rouges, or whatever number of

14  people he had before him, can be believable to any

15  quantifiable extent.  You know, maybe they are telling the

16  truth about something and the jury certainly had the right

17  to think that they were, but now we're into specifics.  Now,

18  we have got to make a specific finding as to what is

19  believable about the first Philadelphia trip, the second

20  Philadelphia trip, were there two other Philadelphia trips,

21  and as to the other guy, Philadelphia trip and New York

22  trips.  We're talking about huge quantities here where one

23  guy is supposed to be cooperating with the narcotics task

24  force and getting credit and he needs to get credit because

25  he goes to jail three different times while he's cooperating

10  Trader, why would he do it now and avoid the clear three or more chances he had to stay

11  out of jail in the first instance simply by telling on Mr.

12  Trader?  I don't understand it.  I don't think there's an

13  explanation except that the guy is not credible.

14       So she wants you to believe that Mr. Trader is

15  involved in multiple kilo transactions based on an

16  uncorroborated testimony crack addict who had numerous

17  opportunities to rat on Mr. Trader where he could have

18  avoided going to jail for doing so.  So he doesn't take

19  advantage of any of those.  He comes in here where he gets

20  nothing in return for doing it and does it.  I don't

21  understand it.

22

23       THE COURT:  Mr. Murphy, clearly that's a valid

24  argument, but at the posture at which we are now, if you are

25  absolutely right about that and I don't believe either of

them made any trips, I would have granted your motion for a

63

1    new trial because you would have -- if I was satisfied none

2    of this happened, it seems to me it's my responsibility to

3    grant the new trial.  But having granting the new trial it

4    seems to me at the very least what you all have to address

5    is can I find by a preponderance of the evidence that there

6    was what, at least a kilo and a half involved in the case

7    and can I find that there were five people involved.

8           MR. MURPHY:  Well --

9           THE COURT:  Because is it never happened we

10   wouldn't be in this posture now.  And, you know, you argued

11   very forcefully early this afternoon that I should do just

12   that but I couldn't and I didn't, and so the question now is

13   how much and how many people?

14          MR. MURPHY:  Well, Judge, I think that's a harder

15   determination than whether to throw out the whole shooting

16   match.  And if you will recall, your criteria for deciding

17   whether to let it go to the jury is radically different than

18   deciding whether you can believe any particular statement

19   about what they have allegedly done.  And remember, Judge,

20   their dates go all over the lot.  They tell the grand jury

21   one thing under oath, they tell the jury another thing under

22   oath.  They say different things about money, quantity,

23   times and places, and so all I'm suggesting, Judge, is that

24   it's not the same determination you have to make in terms of

25   whether to grant a new trial, not at all.

1          Let us assume that the jury found Mr. Trader

2    properly guilty, arguendo, of a single act of conspiracy and

3    that it was proper for you to submit that to the jury under

4    the theory that they could pick and choose what part of the

5    two witnesses to believe.  Well, the government cannot

6    profit from that because if that's what the jury did, and

7    clearly you gave them the power to do it, how did they do

8    it?  We'll never know.  We can't ask them.  Maybe they would

9    have said, we believe they did something, but we'll be

10   damned if we know what it was, but we could all agree that

11   there was something to it.

12          Well, now we are before you.  You're stuck with

13   the finding of the jury that there was something to it, but

14   you've got to figure out unlike the jury exactly what it was

15   and why is it for the first time you have to do that because

16   the government chose not to submit the verdict or special

17   interrogatories where we would know the jury's verdict could

18   have reflected.  We find beyond a reasonable doubt that the

19   Philadelphia trip was proved it involved two kilos, and they

20   could have done that if they wanted to, but they never do

21   because they want the flexibility of getting you to

22   interpolate from the jury's verdict.

23          So all I'm suggesting, Judge, is that my position

24   is not inconsistent with your submitting the case properly

25   to the jury.  I am arguing something different.  I'm saying

65

1    now what are you going to do?  How are you going to decide

2    whether there was that first trip to Philadelphia?  How are

3    you going to decide whether there was that second trip to

4    Philadelphia?  As to Keene.  How are you going to decide

5    what part of it to believe?  And, Judge, it's not

6    intellectually, honestly possible.

7           Now, there's a temptation to say -- and the reason

8    for that, Judge, is because they told us so many lies and

9    gave so many conflicting versions.  But there's a temptation

10   to say ah, shucks, in my gut, I can say it's at least a kilo

11   and a half, or I find that the evidence is enough to believe

12   them all.  But, Judge, I don't think that's you.  I don't

13   think that's the way you want to handle the business at

14   hand.  And it is not inconsistent with what the jury did for

15   you to say but in my own reflective judgment, although I

16   believe that the jury had a rational basis to find him

17   guilty of conspiracy, I can't articulate what it was.  But

18   independent of that rational basis, I cannot now say whether

19   they are credible as to any of the particular trips,

20   although I do not mean that to suggest that the jury could

21   not have said that because your roles are independent.

22          The jury can choose to believe what you would not

23   choose to believe, so the jury may have found validity in

24   one of those trips and you may find invalidity in that trip.

25   Nothing constitutionally improper about that and that does

66

1    not compel you to find or to grant a new trial, and so your

2    function is independent.  So I guess, as Jim Brown said to

3    Richard Pryor, what you going to do?  The ball is in your

4    court.  All I can do is demonstrate that these people are

5    not credible people, and, Judge, we all know that.  We all

6    know that the only reason the government uses them is

7    because the government has to use them, but that does not

8    exult their credibility, it just puts the government in a

9    bad position.  And so we can't avoid the government being in

10   a position today.  They are in a bad position because they

11   had to use the lowest integrity human beings available for

12   this kind of job.  And so we cannot falsely exult their

13   credibility simply because they appeared, and we certainly

14   cannot say that as to any specific incident their

15   credibility was ratified by this jury.

16           So I think the least you can do, Judge, I think

17   there are two alternatives at the low end, and I would ask

18   you to adopt the first of my suggestions.  You can say that

19   you find that although there is a rational basis for the

20   jury's verdict, that their function was independent of

21   yours, and that you cannot find that as to any particular

22   transaction the government has met its burden of showing by

23   a preponderance of the evidence that Mr. Trader brought in a

24   certain quantity of drugs.  And that does not mean that the

25   jury could not have done that, but you simply did not get

67

1    any information from the jury's verdict as to any particular

2    transaction and you're unable to state because you can't

3    pick and choose which testimony by these perjurers was

4    credible.  And you gave them the right to pick and choose,

5    it follows you have the right to pick and choose.  You can

6    believe all of their testimony, part of their testimony, or

7    none of their testimony, and you are not bound on any of

8    three options by the jury's verdict.

9         Now, I think Judge Gambis resolved it by doing the

10   next suggested alternative.  What he did was he said I just

11   find the lowest drug level because I'm not convinced that I

12   can reliably go any higher than that.  Now, what's the

13   lowest drug level in this case?  It would be conspired to

14   possess five grams or more of crack cocaine.  Because my

15   client is a second offender, he faces double mandatory

16   minimum penalty of 10 years.  Ordinarily, if this were a

17   first offense, he would face a mandatory minimum penalty of

18   five years.  And I think that that would be a similar, or

19   rather, an alternative that you could follow.

20        Beyond that, Judge, I think you are in an

21   impossible position because on the merits the testimony is

22   all over the lot in terms of when and where and how and

23   under what circumstances.  That's the number one.  Number

24   two, their credibility is just terrible, it's just terrible.

25   I mean, we had kids like this.  Well, let me put it another

68

1    way.  How do we react to these kinds of people's

2    credibility?  Let's suppose we want to hire an associate in

3    the law firm.  They have to have impeccable credibility.

4    One conviction of a crime of moral turpitude knocks him out

5    of the box because his credibility can forever be called

6    into question unless there's been some redemptive behavior.

7            Well, as to Mr. McKnight, what was it, 10

8    convictions of crimes involving moral turpitude while he's

9    on probation, while he's under court orders, while he's

10   working for the drug task force.  No redemptive behavior

11   there.  He's getting worse by the minute.  Crack cocaine

12   addiction, no redemptive behavior.  So I guess to put it

13   another way, Judge, the government wants you to use drug

14   logic in coming up with a ratification, as it were, of any

15   particular transaction instead of the logic that you use in

16   your every day experience with human beings.  I am asking

17   you to use that every day experience.

18           THE COURT:  Okay.  Ms. Manuelian, let me hear from

19   you in regard to, it seems to me, two aspects, quantity and

20   role in the offense.

21           MS. MANUELIAN:  Yes, Your Honor.  Your Honor, I

22   think that in instances where there are special verdicts,

23   those usually pertain to occasions when there are differing

24   theories that are presented.  There is no requirement that

25   the Court has to go beyond the jury's finding and have them

69

1   make a determination on each item of evidence.  And as the
2   Court has already indicated when Mr. Murphy was addressing
3   this issue, you have already made a ruling with respect to
4   the sufficiency of the evidence, and I'm sure Mr. Murphy is
5   going to want to rebut what I am saying.  Perhaps --
6           THE COURT:  Well, may be --
7           MS. MANUELIAN:  -- I can have a opportunity --
8           THE COURT:  He might be going to say that you
9   don't have to address some issue or something.  I don't
10   know, but why don't we interrupt and find out.
11           MR. MURPHY:  Judge, I hate to interrupt Ms.
12   Manuelian.
13           THE COURT:  It's like flipping a coin, Ms.
14   Manuelian, it may be good or it may be bad.
15           MR. MURPHY:  I hate to interrupt and I don't like
16   to interrupt, but my client pointed out something that I
17   think would only be fair for me to put before the Court and
18   give Ms. Manuelian a chance to rebut in addition to
19   everything else.
20           THE COURT:  Okay.  All right.  This is an addendum
21   to your presentation to the Court.
22           MR. MURPHY:  Yes.  And, Judge, I wouldn't have
23   interrupted unless I thought my client's point happened to
24   be a good one because clients tell you to do stuff all the
25   time that you just reject out of hand in your own

1  independent judgment, but I think he's right and there's

2  something I have forgotten to argue.

3          There is no evidence in this case except through

4  the mouth of Moon and Hook that Mr. Trader was involved with

5  crack cocaine because all of the witnesses testified they

6  had brought back powder cocaine.  Now, the government's

7  theory that this is crack -- and I thank Mr. Trader for

8  reminding me of this, or for suggesting it, not reminding me

9  -- the government's theory is that this is all crack

10  cocaine.  And neither one of these men was in a position to

11  say that they saw Mr. Trader or that they ever had any crack

12  cocaine in the presence of Mr. Trader in terms of quantity

13  except I believe it was the witness McKnight who testified I

14  think incredibly that he was selling crack for Mr. Trader on

15  the street corners.

16          THE COURT:  Well, one of them certainly testified

17  to that.

18          MR. MURPHY:  Right.  And he testified as to no

19  quantities in terms of the crack that he was allegedly

20  dealing from the street corner, so it's entirely speculative

21  as to what he's doing.  And, as you know, crack is sold on

22  street corners in very small quantities, subgram quantities,

23  because that's the way it's bought for $10.  And so you have

24  no crack evidence before you except the hearsay statement of

25  Moon.  And you saw Hook testify.  Hook came in, he said I'm

1    not afraid of the government, I don't need immunity, I'm

2    going to come in.  If they want to charge me with this

3    stuff, and significantly they had not, I'm going to take my

4    chances because I wasn't involved in any crack cocaine

5    cooking for Mr. Trader.

6         And we don't know whether the jury credited his

7    testimony, but I ask you to do so, because if he's going to

8    take that kind of risk -- I can't give him a plea agreement,

9    I can't give him immunity -- if he's going to take the risk

10   of putting his neck in the noose by coming here, then I

11   think he deserves to be believed.  So that nullifies all of

12   this -- and Moon, by the way, was not the guy who converted

13   the crack -- the powder to crack, it was Hook who did it.

14   You heard from Hook.  You are in the position to evaluate

15   his credibility.

16        Did the government lay a finger on him?  No, they

17   only did a guilt by association cross-examination because

18   they could not prove anything to impeach this man's

19   credibility compared to the level of impeachment of Mr.

20   Trader's accusers, which was substantial.

21        THE COURT:  Okay.  Thank you.

22        MR. MURPHY:  And thank you for permitting me to

23   interrupt.

24        THE COURT:  You can address the whole ball of wax

25   now, Ms. Manuelian.

1      MS. MANUELIAN: Yes, Your Honor. Actually both

2  Mr. Trader and Mr. Murphy are incorrect with respect to the

3  evidence of Mr. Trader selling crack cocaine. Both Mr.

4  McKnight and Mr. Keene testified that they obtained

5  quantities of crack cocaine to sell to their own customers.

6  The testimony for Mr. McKnight was that in either '89 or '90

7  when he first began obtaining crack cocaine from Mr. Trader,

8  he got two eight balls and thereafter he obtained one ounce

9  per week of crack cocaine from him and it was always in

10  crack form.

11      Mr. Keene testified that in 1990 he bought on a

12  number of occasions anywhere from one-half ounce quantities

13  to one-quarter kilo quantities of crack cocaine from Mr.

14  Trader to sell to his own customers. And then both McKnight

15  and Keene testified that for each of the trips that they

16  made with Moon to Philadelphia or New York to obtain

17  quantities of cocaine powder, that Moon represented to them

18  that those quantities were going to be cooked into crack

19  cocaine for Mr. Trader. And both Keene and McKnight that

20  they knew Mr. Trader was selling crack cocaine. And I think

21  actually, for what it's worth, I don't know if the Court is

22  going to credit it or not, Officer Nelson testified that in

23  the area that we were talking about in which Mr. Trader was

24  operating that crack cocaine was the drug that was sold on

25  the street. Actually I think Mr. Keene and Mr. McKnight may

73

1    have also testified to that fact as well.

2          So there's ample evidence in the record, Your

3    Honor, that the cocaine powder that was being obtained by

4    Mr. Trader was for the purpose of converting it to crack

5    cocaine to sell in the area that he was working in

6    Cambridge.

7          Now, as I was saying before, before Mr. Murphy got

8    up to add his addendum --

9          (Brief pause.)

10          THE COURT:  Go ahead, Ms. Manuelian.

11          MS. MANUELIAN:  Your Honor, Mr. Gurney pointed out

12    to me also that the indictment itself, the charge of which

13    Mr. Trader is being convicted, specifically charges him with

14    distributing or possessing with intent to distribute cocaine

15    base, so clearly that was a finding of the jury that this

16    conspiracy was for distribution of crack cocaine.

17          Now, as I was indicating early on, Your Honor, the

18    Court has made it very clear that it has found that there

19    was sufficient evidence to support the jury's verdict.  So

20    at this point, what the Court needs to do is make its own

21    credibility assessment as to what it is going to determine

22    to be the amount that was foreseeable to Mr. Trader as part

23    of this conspiracy, and that assessment is made the same way

24    that the jury made its credibility finding.

25          And what you can rely on, Your Honor, in terms of

74

1   crediting the testimony of both Keene and McKnight are the

2   factors that I alluded to a little bit earlier.  The fact

3   that there are internal consistencies between what they say;

4   they both make reference to Moon; they both -- the trips

5   that they made were a very similar M.O. in the way in which

6   they dealt with Mr. Trader; they both talk about how they

7   obtained crack cocaine from him to sell; they both talk

8   about how Hook was the individual that cooked the cocaine

9   for Mr. Trader.  There are consistencies about how they

10  dealt with Mr. Trader are almost identical.  And so in

11  crediting that, you then look to what each individual says

12  about the amounts that they distributed.

13          And I think the evidence also indicated that with

14  the exception of the flip flop that Mr. Keene had on the

15  first two trips, the grand jury testimony of both witnesses

16  was consistent in the amounts that they testified to at

17  trial.  Mr. McKnight testified that, as I said before,

18  between 1990 and '91 he obtained an ounce a week from Mr.

19  Trader to sell to his own customers of crack cocaine.  He

20  took four trips with Moon.  The first trip was for a kilo.

21  The second trip was for a kilo.  The third trip was for five

22  kilos, and the fourth trip was between eight to ten

23  kilograms of powder that they obtained to subsequently have

24  cooked into crack for Mr. Trader to distribute.

25          Mr. Keene testified that in 1990 he obtained half

1    ounce to quarter kilo quantities of crack from Mr. Trader on

2    a number of occasions to sell, and then he talked

3    specifically about four trips that he made between '89 and

4    1990 much in the same way that Mr. McKnight made trips.  The

5    first trip was for a kilo.  The second trip he said was for

6    two kilos, but half of the money for that came from another

7    individual by the name of Troy Perkins.  Therefore, we are

8    only crediting one kilo out of those two kilos to Mr.

9    Trader.  And then the third and fourth trip were each for

10    half a kilo apiece.

11         So if we take just the trips alone that Mr. Keene

12    and Mr. McKnight testify about, you're looking in the realm

13    of 15 to 17 kilos of powder, and we'll take the lower of

14    that number to benefit the defendant.

15         Under the crack conversion of 88 percent, which

16    has been accepted by the Fourth Circuit in the case of

17    United States versus Pazz, which I cited to in my memorandum

18    to the probation department and which Mr. Skozilas relied on

19    in his calculations, you would have 18 kilos of powder

20    between McKnight and Keene and that converts to a little

21    over actually 15.84 kilos crack.

22         Now, under the revised guidelines of the tables

23    under 2D1.1, all the Court needs to do at this point is to

24    find that there was at least 1.5 kilograms of crack cocaine

25    or more and Mr. Trader will be at the top of the guidelines,

1    which will be a level 38.  If you were to discount all of

2    the cocaine powder that was obtained during the trips and

3    just look at the testimony about what Mr. McKnight and Mr.

4    Keene obtained in crack cocaine from Mr. Trader to sell to

5    their own customers, you are above the 1.5 kilograms of

6    crack, because if you credit Mr. Keene's or Mr. McKnight's

7    testimony that he received one ounce a week, that translates

8    into 48 ounces of crack cocaine for the year.  There are

9    28.35 grams in an ounce which would essentially be 1.36

10   kilograms.  And then Mr. Keene testified that on a number of

11   occasions he received a half an ounce to a quarter kilo.  If

12   we just take the one quarter kilo and add that to what Mr.

13   McKnight testified about, you are already at 1.6 kilos of

14   cocaine, Your Honor, so crediting either facet of the

15   testimony or all of it of Keene and McKnight, you are well

16   beyond the 1.5 kilograms of crack cocaine that is necessary

17   to find a base offense level here of a level 38.

18          And I think, Your Honor, given the consistencies

19   between these two witnesses that there is more than ample

20   evidence in the record to credit the entire amount and that

21   what we should -- the finding of the Court should be is that

22   we're talking in the realm of at least 15.84 kilos of crack

23   or possibly more.  The 15.84 kilos is based solely on the

24   cocaine powder and the crack version, and that doesn't even

25   take into account the additional 1.6 kilos that we could

1    credit from the testimony of what they received individually

2    to sell on the street.

3             Now, with respect to role, Your Honor.  As I --

4    oh, and just for the record, Your Honor, I had earlier

5    supplied the Court with a copy of the memorandum summarizing

6    the fact -- the testimony at trial that I had given back in

7    August to both Mr. Murphy and Mr. Skozilas, which Mr.

8    Skozilas summarized in part in the PS, the presentence

9    investigation report, but the calculations that I have

10   alluded to here are summarized on page eight of -- eight and

11   nine of the government's memorandum.

12            And I am not even going to make any reference,

13   Your Honor, to the crack cocaine that was sold to Officer

14   Nelson, even though the guidelines are very clear that even

15   though Mr. Trader was acquitted of those counts, the Court

16   can still take that amount into consideration, but I don't

17   think it's necessary and I'm certainly not going to rely on

18   it.

19            Now, with respect to the role, Your Honor, based

20   on the testimony of Keene and McKnight, we know that Mr.

21   Keene supplied, was a courier, was a distributor, we know

22   that Mr. McKnight was a courier and a distributor, we know

23   that Mr. Moon was a courier.  He was the one that

24   accompanied Keene and McKnight on all the trips to

25   Philadelphia and New York.  We know from their testimony

78

1   that Hook was the individual who cooked crack cocaine or at
2   least there was some other individual out there that cooked
3   crack cocaine and I don't think Mr. Melpar Jones' testimony
4   is really in any way contradictory to the evidence of the
5   fact that somebody was cooking crack for this organization.
6   And Mr. Keene testified that he had personal knowledge from
7   his discussions with other individuals on the street who
8   were dealing with Trader that there were at least four other
9   people who were obtaining crack cocaine from Trader.  And I
10  cited to the transcript where he testifies to the fact that
11  Brian Smith, Andrew Simms, Mike Albert, and Shawn Todd were
12  four people that he knew of directly from his contact with
13  those people that they were obtaining crack cocaine from Mr.
14  Trader to distribute.

15          Mr. McKnight testified that he knew his cousin
16  sold crack cocaine for Trader.  I think the record, based on
17  the testimony of the two cooperators, more than bears out
18  the presence of five or more individuals in this conspiracy
19  to support a finding that Mr. Trader was an organizer or a
20  leader.  And actually, Your Honor, the guidelines specify
21  that it's either the presence of five or more people or the
22  conspiracy was otherwise extensive, so even if the Court
23  were to find that there weren't five or more, if there is a
24  finding that this conspiracy was an extensive conspiracy of
25  which Mr. Trader was a part, I think that the calculation

79

1    for role would be appropriate.

2              And the basis for that, Your Honor, is in the

3    application note four which is contained in the -- in

4    Section 3B1.1 which talks about aggravating role.  And the

5    factors that the Court needs to look at to make a decision

6    as to whether or not Mr. Trader qualifies for the four level

7    enhancement would be the exercise of decision making

8    authority that he had, the nature of his participation in

9    the commission of the offense, the recruitment of

10   accomplices, the claimed right to a larger share of the

11   fruits of the crime, the degree of participation and

12   planning or organizing the offense, and the nature and scope

13   of the illegal activity as well as the degree of control and

14   authority exercised over others.

15             And in all of those categories, Your Honor, I

16   think it's very evident that the people who testified in

17   this courtroom, namely Mr. Keene and Mr. McKnight, were

18   working for Mr. Trader.  They were obtaining cocaine for Mr.

19   Trader.  He was the person that they ultimately gave it to.

20   He paid them a fee for making those trips.  There was

21   testimony that Moon would get an ounce of cocaine and

22   $1,000 as payment for accompanying Keene and McKnight to

23   Philadelphia and New York.  He was the ultimate recipient of

24   the fruits of this offense.  He was the one that made the

25   larger share of the proceeds out of this.  He was the one

80

1    that recruited Keene and McKnight to assist in getting

2    cocaine for him.  And on all of the categories that are

3    contained in Section 3B1.1, I think more than sufficiently

4    establishes that this individual should receive a four level

5    enhancement as an organizer or leader of this particular

6    conspiracy.

7              THE COURT:  Okay.  Back to you, Mr. Murphy.

8              MR. MURPHY:  So she wants you to believe a man who

9    doesn't even know the name of his own cousin who is supposed

10   to be dealing from Mr. Trader.  And all that we have to do

11   to establish a role enhancement is just to give a couple of

12   extra names, and by magic, no matter what the source, they

13   become etched in stone, granite-like, rather than coming

14   from the people who had no credibility.

15             Judge, this is a credibility case, it's your call.

16   You don't have to enhance four levels.  If you believe that

17   these people are not credible enough for the government to

18   get all of what it wants; likewise as to quantity, you don't

19   have to go that far.  Now, let me deal with the intriguing

20   possibility that Ms. Manuelian flowed and probably in

21   anticipation of how you would think.

22             She said, okay, let's take away the trips to

23   Philadelphia and the trips to New York and implicit in that

24   is, well, we know we've got problems, and by the way it

25   wasn't just a flip flop.  Remember, there was $56,000 and

81

```
1    two kilos in front of the jury, and $28,000 and one kilo
2    about that flip flop trip.  And I don't mean -- we're
3    talking about the same trip now, so clearly this kid didn't
4    have the story straight.  And it's really incredible that he
5    would have been $56,000 minus $28,000, $28,000 out of place
6    in his recollection because $28,000 to a little kid like
7    that is a lot of money.  But putting that aside, she says
8    let's just look at McKnight's testimony that he sold one
9    ounce per week and they give you 48 weeks, a short year, and
10   it comes to 1.36 kilograms.
11            Well, there's a case right on point and we cited
12   it in our memo.  In that case, United States versus Shenubi
13   (phonetic), and that is where the Second Circuit said, look,
14   we can't -- it is not enough for a trial judge to take a per
15   week version of testimony and then go from that to make a
16   finding by multiplying how much he did per week.  That's
17   just not enough evidence and Shenubi is a leading case on
18   that particular point.  I don't think there are any Fourth
19   Circuit cases on that point.
20            And so under the rationale of Shenubi, you can't
21   take one ounce per week if that was the total amount of the
22   testimony, multiply it by the number of weeks and come up
23   with an aggregate amount.  So you would go below the 1.5
24   kilogram benchmark in this case.  I remind the Court, how
25   much flesh does the government want?  My client's an elderly
```

1   guy.  I mean, he's in his 60s, late 50s, they are asking for

2   a life sentence.  They want you to give him 360 months.  My

3   God, and there is testimony across the country now where

4   experts from the government are now saying look, the

5   physiology of crack cocaine is no different than the

6   physiology of powder cocaine contrary to all this mother wit

7   we've been ingesting.  And there is a Louisiana U.S.

8   District Court judge who has so found and he set aside the

9   crack cocaine, powder cocaine differentia because they don't

10   make physiological sense, and he based that set-aside on an

11   expert from the National Institutes of Health who testified

12   for him.

13            So they want an awful lot of time for a guy who is

14   not a member of the Mafia, no machine guns, no murder, they

15   want 30 years of his life.  I think we have to put that in

16   perspective, and they want to base that on the credibility

17   of two people who have no credibility.  And they want you to

18   infer that from a jury verdict which could have been based

19   on the smallest acceptance of their testimony by your own

20   instructions.

21            So, Judge, please tell the government they have

22   got to come up with more than this if they want the Court to

23   reliably be able to find quantities of the kind that they

24   suggest which sets draconian penalties.  And I'm reminded,

25   in conclusion, of the following language, and this is from

84

1    as a result of their activities.

2            I must address the issue of quantity, and this

3    relates obviously to the testimony of witnesses McKnight and

4    Keene.  The Court viewing their testimony in its entirety

5    and in the circumstances of this case and recognizing that

6    because of the nature of these witnesses their credibility

7    has to be closely scrutinized, and indeed, the Court has

8    done so, first, let me state that I, on the basis of the

9    evidence presented, I find that each of them was, indeed,

10   involved in this conspiracy.  I find by a preponderance of

11   the evidence that each of them made at least one trip out of

12   town in furtherance of this conspiracy.

13           And as to Mr. Keene, certainly the Court is

14   prepared to find at the least that the two trips as to which

15   he testified before the grand jury were, in fact, made for

16   the purposes he testified to.  As to Mr. McKnight, I find by

17   a preponderance of the evidence that he made at least one

18   trip.  The evidence supports that he probably made more.  I

19   just have a gut degree of skepticism about the big trip, the

20   eight to ten kilo trip, but that is not -- I am not finding

21   that that was part of the quantity.  But, in any event, on

22   that basis, the quantity involved was clearly more than a

23   kilogram and a half and in all likelihood on the basis that,

24   as I say, I find that Keene made two trips, I think that

25   probably gets to probably two or three kilos.  Mr. McKnight,

1    even if he made one trip, it was probably one kilo -- it was

2    a kilo, so under any circumstances by a preponderance of the

3    evidence from the testimony of both of them and weighing

4    their credibility carefully I find that they were involved

5    to the extent in excess of one and a half kilos.

6          The final issue I must address is the role in the

7    offense. And the probation officer found that Mr. Trader

8    was an organizer or a leader of a criminal activity

9    involving five or more participants or was otherwise

10   extensive. The Court has analyzed this testimony carefully.

11   And in light of the concern that the Court has about the

12   credibility of these two witnesses, the almost off-hand or

13   throw-away comment in regard to one of their cousins of

14   being involved I do not find sufficient to find that that

15   person was a member of this conspiracy.

16         The same applies to those four who were mentioned

17   albeit in their testimony almost in passing with no details

18   at all as to their involvement in this conspiracy. I'm not

19   prepared to find by a preponderance of the evidence that

20   those four individuals as to whom we know very little else

21   were members of this conspiracy. So the crux of this

22   problem comes down to Hook, and here Hook testified at this

23   trial. He testified that he was not involved. He has some

24   credibility problems. As I recall, he had a prior

25   conviction. And in addition, the circumstances at least

86

1    arouse suspicion.

2              Off-setting this we have really -- the evidence

3    consists of these two cooperating witnesses both saying, as

4    I recall, that Moon told them that Hook was cooking the

5    cocaine.  This evidence is two steps removed from the person

6    who can tell us, and the person who can tell us denies it.

7    And in light of the fact that the cooperating witnesses'

8    testimony must be placed under scrutiny because of

9    credibility problems, I am not prepared to find by a

10   preponderance of the evidence on this limited evidence

11   before me that Hook was, indeed, a co-conspirator.  And

12   under those circumstances, the number of conspirators would

13   not be five or more but would be four.  The probation

14   officer has also found that the conspiracy was otherwise

15   extensive, and the Court just is not prepared to find that

16   in light of overall evidence before the Court.

17             So, accordingly, the finding of the Court is that

18   the base offense level is 38 increased by two levels under

19   3B1.1(c) which makes an adjusted offense level of 40 and it

20   is Criminal History Category II.

21             On the evidence in this case, the Court finds that

22   Mr. Trader was indeed an organizer, leader, manager or

23   supervisor which brings him within the ambit of 3B1.1(c).

24   Accordingly, the sentencing guideline range in this case is

25   324 to 405, and I so find.

1              Now, are there any motions for departure?

2              MR. MURPHY:  Yes, Your Honor.  Mr. Trader was

3     given a six-year sentence for possession with intent to

4     distribute crack cocaine back in 1991 and based on conduct

5     that occurred in February of 1991, you have that conviction,

6     the PSI.  And a State sentence for conduct which would be

7     included in a conspiracy, because clearly this conduct -- by

8     the way, it was in Cambridge, Maryland.  This conduct would

9     have otherwise been included in this conspiracy.  It is a

10    factor that you can take into account because it isn't

11    something that the commission took into account to a kind or

12    to a degree, using their language.  And I would, therefore,

13    ask you to deduct that six-year sentence.

14             THE COURT:  What were the allegations in this case

15    as to the duration of the conspiracy?

16             MR. MURPHY:  From 1989 to 1992.  So I would ask

17    you to deduct that six-year sentence from the sentence that

18    you would impose in this case; in other words, reduce the

19    guideline range by 72 months so that the guideline range

20    would be, if I may, 252 months to 330 months.

21             And, Judge, my client's age I think is a

22    mitigating factor as well, although based on that ground

23    alone you could not depart.  And I recognize that the Fourth

24    Circuit has taken a strong view about that, but under the

25    circumstances I believe that this ought to be a low end

88

1    sentence of 252 months because in determining where in the

2    guideline range you can fall, you can properly take into

3    account his age.  And let's face it, Judge, it's a life

4    sentence for him.  He will probably -- if he gets the 252

5    month sentence, he'll probably die in prison.  I don't wish

6    that on him but at his age --

7              THE COURT:  Incidentally, just so the record is

8    stated, according to the probation report, Mr. Trader is not

9    as old as you cited to the Court.

10             MR. MURPHY:  How old is he?

11             THE COURT:  44.

12             MR. MURPHY:  44. 45.

13             MR. SKOZILAS:  That would mean Mr. Murphy is a

14   great-grandfather.

15             THE COURT:  So --

16             MR. MURPHY:  Judge, I'm 52.  Look, well, I guess

17   it's because of the stress of the --

18             THE COURT:  Well, no, and I just wanted that --

19   I'm not minimizing or ignoring anything --

20             MR. MURPHY:  And I'm sorry, I didn't --

21             THE COURT:  -- you're telling me, Mr. Murphy.

22             MR. MURPHY:  And I did not certainly mean

23   intentionally to mislead the Court.

24             THE COURT:  And the thrust of your argument may

25   still be entirely correct but --

89

1          MR. MURPHY:  That's right.  And so if you add the

2     252 months which is essentially --

3          THE COURT:  Well, you add 20 years to 45, it's 65.

4          MR. MURPHY:  20 years, that's right.  That's his

5     life expectancy.

6          THE COURT:  Okay.  Well, let me hear from the

7     other side in regard to this motion for departure.

8          MS. MANUELIAN:  Your Honor, if I may address that

9     issue.

10          THE COURT:  Yes.

11          MS. MANUELIAN:  The conspiracy in this case was

12     charged from November of 1989 to October of 1991, and for

13     the prior State conviction for drug possession was --

14     apparently Mr. Trader was arrested in February of 1991, and

15     obviously that was not a conspiracy charge as in this case.

16     He was charged in this case with a conspiracy.  He was

17     convicted of a substantive count in state court and received

18     a parolable sentence.  And I believe he was released on

19     parole on August 19th of 1993 until he was arrested on this

20     case in September of 1993.

21          I think that the guidelines actually address this

22     issue.

23          MR. SKOZILAS:  It's 5G1.3.

24          THE COURT:  Okay, 5G --

25          MR. SKOZILAS:  1.3, Your Honor.

1          THE COURT:  Okay.

2          MR. SKOZILAS:  Page 299 of the --

3          THE COURT:  `I got it.  And where in here should I

4   be looking?

5          MR. SKOZILAS:  Actually (c) because this is the

6   other case which is at page 300 at the top.

7          THE COURT:  Ms. Manuelian, I'm just not sure where

8   that fits in.

9          MS. MANUELIAN:  Actually I'm not sure that that --

10         THE COURT:  I guess more pertinent, my question

11  would be if Mr. Trader here had been convicted of the

12  conspiracy charge together with a charge of possession with

13  intent to distribute in February of '91, what would have

14  been the impact of that second conviction in the sentencing

15  process?  My guess is it wouldn't add a thing.

16         MS. MANUELIAN:  It wouldn't add a thing, Your

17  Honor.  Most probably it would be sentenced concurrently

18  with a conspiracy count.  I am not sure that 5G1.3 is the

19  applicable guideline.  I think where we go to is in Section

20  4A1.2 where it talks about what prior sentences are and if

21  they are related or not.  I don't think that there really is

22  any impact at all on the termination of the case here or

23  that a downward departure is appropriate in this instance.

24  I don't think that's what the guidelines say.

25         THE COURT:  Well, I'll have to look.  This is hard

91

1    to follow.

2              MR. MURPHY:  Judge, I don't think this guideline

3    applies to this situation.

4              THE COURT:  I suspect you might be right.

5              MR. SKOZILAS:  I am a little bit confused.  He's

6    actually released from imprisonment at this point.

7              THE COURT:  Yes, he's served whatever portion of

8    his sentence -- I assume he served whatever portion of his

9    sentence the State of Maryland held him to.

10             MR. MURPHY:  He's on parole, Judge.

11             THE COURT:  He's on parole?

12             MR. MURPHY:  This will probably violate his

13   parole.

14             THE COURT:  Yes, he's on parole.

15             MR. MURPHY:  And so I think he's looking at the

16   possibility of a consecutive parole term.

17             THE COURT:  Well, when we start looking at 4A,

18   you're talking about how to compute the sentencing

19   guideline.  I mean, how the criminal history category.

20   Excuse me.

21             MR. SKOZILAS:  Your Honor, this is the way this is

22   done.  If the Court determines that this is related, and I

23   presumed it was not related, but if the Court determines

24   that this is related, he would not receive any criminal

25   history points for this charge.  Therefore, he would be a in

92

1    Criminal History Category I.    And then the new guideline

2    range would be 292 to 365.

3            THE COURT:  Yes, I got you.  On behalf of the

4    probation office that would be your interpretation of it.

5    Yes.

6            MR. SKOZILAS:  If you determine that this is

7    related.

8            MS. MANUELIAN:  And, Your Honor, actually the low

9    end of Category History II, 324 months, falls within the

10    guideline range that would be applicable if this were a

11    related sentence under Category History I.

12            MR. MURPHY:  That's actually cheating him a little

13    bit there, Judge, because he's entitled to your

14    consideration of the proper guideline range.

15            THE COURT:  Oh, yes.  No, I understand that.

16            MR. MURPHY:  And that doesn't really -- the

17    argument that Ms. Manuelian made and I think the observation

18    you made actually cuts in our favor because if you would not

19    have added to the sentence you would have imposed here, then

20    necessarily it's unfair for it to, in fact, add on to the

21    sentence by having it already be an additional term of

22    imprisonment.  In other words, if Ms. Manuelian had brought

23    the charge here instead of it being a separate State charge

24    for related incident, he would not be penalized by the

25    additional sentence that he has already done.

93

1      THE COURT:  I suspect that's right, it wouldn't

2  add anything.

3      MR. MURPHY:  Right.  So I think he's entitled to

4  the full 60 months deduction -- 72 months, rather, and that

5  would take him down to 200 months -- 220 months at the low

6  end of the guideline range because the criminal history

7  point would not count against him, so it would be Category I

8  if you determine it was related conduct.  It's double

9  punishment, so the 72 would subtract from the 292, so he

10  would get a low end of 220.  That's still a lot of time,

11  Judge, a whole lot of time.

12      MS. MANUELIAN:  Your Honor, if I may.  I think I

13  have figured out how these guidelines apply.  Section 4A1.2

14  defines what a prior sentence is.  Subsection 2 says prior

15  sentences imposed in unrelated cases are to be counted

16  separately.  If they are imposed in related cases they are

17  to be treated as one sentence for purposes of 4A1.1(a), (b)

18  and (c).  Then it says use the longest sentence of

19  imprisonment if concurrent sentences were imposed in the

20  aggregate sentence of imprisonment imposed in the case of

21  consecutive sentences.

22      THE COURT:  Now, that would have been if it had

23  been a federal charge here?

24      MS. MANUELIAN:  Correct.  Under the Application

25  Note 2, 4A1.2 it defines what related cases are in Note 3

94

1    and states that -- let's see, prior sentences are considered

2    related if they resulted from offenses that occurred on the

3    same occasion and were part of a single common scheme or

4    plan or consolidated for trial or sentencing.  Arguably this

5    could be -- this prior possession count could be part of the

6    single conspiracy that Mr. Trader has been accused of.  And

7    then it goes on to say that the Court should be aware that

8    there may be instances in which this definition is overly

9    broad and will result in a criminal history score that under

10   represents the seriousness of the defendant's criminal

11   history in the danger that he presents to the public.  And

12   an upward departure might be warranted in that instance.

13            I think that that language there and given the

14   treatment of this case if the two cases were sentenced

15   together in this courtroom, I think that language, given the

16   nature of this conspiracy that it's a crack cocaine

17   conspiracy and how much cocaine was distributed in this

18   case, warrants the Court making a determination that what

19   would have been the low end of the guidelines under Category

20   II, 324 months, but which falls somewhat toward the lower

21   end of Category I would be the appropriate sentence in this

22   case.

23            And I think that solves the problem of dealing

24   with what the prior related sentence in terms of what would

25   be the appropriate sentencing.  The Court is to make a

95

1    determination that Mr. Trader should really be at a Category

2    I as opposed to a Category II which I think is where the

3    calculations would end up if you find that that is, in fact,

4    a prior related sentence that should not be counted

5    separately against the defendant.

6              THE COURT:  Well, do we --

7              MR. MURPHY:  Again, Judge, I don't --

8              THE COURT:  Is there anything in this book that

9    gives any hint as to what happens where this prior related

10   offense a person has been convicted and actually served the

11   time?

12             MR. SKOZILAS:  No, Your Honor.

13             THE COURT:  Now, see, that's the additional

14   factor.  And, Mr. Skolizas, I understood how you interpreted

15   this and it sounds consistent with what I'm seeing here, but

16   it leaves unexplained in the book as to what happens in the

17   unique circumstance here where Mr. Trader actually has

18   served a sentence.

19             MR. SKOZILAS:  It's not addressed.  Someone else

20   in the office had something very similar.

21             THE COURT:  There's always something new under

22   these guidelines, that's for sure.

23             MR. SKOZILAS:  If the Court finds it related and

24   if the Court can do a constructive departure, take what he

25   actually served and subtract that from the guidelines or

96

1    from the sentence the Court would impose of him.

2         MR. MURPHY:  Judge, I think we're in the same

3    church but different pews.

4         THE COURT:  Well, that's probably a fair

5    appraisal, Mr. Murphy.

6         MR. MURPHY:  I think that you've got to also take

7    into account that this is going to violate his parole.  And

8    the only fair way to do --

9         THE COURT:  Well, but of course we also can take

10   into account that knowing the state system, they'll make

11   whatever they do to him concurrent with the federal

12   sentence.

13        MR. MURPHY:  Judge, I've seen it both ways.  I

14   have, and there's no way to accurately predict that.

15        THE COURT:  No, I'm sure there's no way of knowing

16   for sure.

17        MR. MURPHY:  Yes, so I think --

18        THE COURT:  Well, just so I have the entire

19   picture before me though, Mr. Murphy, without prejudging

20   this at all, how long did Mr. Trader serve?

21        MR. MURPHY:  Mr. Trader?

22        THE DEFENDANT:  I think it was 22 months.

23        MR. MURPHY:  22 months, I believe.

24     (Brief pause.)

25        THE COURT:  Oh, we may have it in the --

97

1           UNIDENTIFIED SPEAKER:  On April 2, 1992, he was --

2           MR. MURPHY:  He was paroled on August 19 of '93,

3   and I believe he began serving his sentence -- well,

4   presumably February 2nd of '91, so --

5           MS. MANUELIAN:  No, I'm not sure about that, Your

6   Honor.

7           UNIDENTIFIED SPEAKER:  He was sentenced on April

8   2, 1992.

9           MS. MANUELIAN:  I thought he was released on bond.

10  I mean, he may not have been actually serving time since the

11  date of his arrest which is something that's not clear.

12          MR. MURPHY:  Well, let's ask Mr. Trader himself,

13  Judge.  Mr. Trader, what day did you get committed to the

14  institution?

15          THE DEFENDANT:  I went to court on February 2nd,

16  '92.

17          MR. MURPHY:  And you were released when?

18          THE DEFENDANT:  On August the 19th.

19          THE COURT:  February of '92, Mr. Trader?

20          THE DEFENDANT:  Yes.

21          THE COURT:  That was when the jury -- that's when

22  the verdict was returned?

23          THE DEFENDANT:  That's when the verdict.

24          THE COURT:  That sounds probably right I would

25  think.

98

1                THE DEFENDANT:  And I got out in August.

2                MR. MURPHY:  Of what?

3                THE DEFENDANT:  '93.

4                MS. MANUELIAN:  It's a little over six months,

5      Your Honor.

6                THE COURT:  Yes.

7                THE DEFENDANT:  It's more than six months.  It's

8      more than six months --

9                MS. MANUELIAN:  February '92 until August of --

10               MR. SKOZILAS:  It's '93.

11               MS. MANUELIAN:  Oh, '93.  Oh, I'm sorry, the

12     following year.

13               THE COURT:  No, no, no.  At this hour, none of us

14     can do simple arithmetic, I think, and I'm with you, Ms.

15     Manuelian, I can't either.  It's 18 months.

16               MS. MANUELIAN:  Eighteen months.

17               THE COURT:  Eighteen months, yes.

18               MR. MURPHY:  May I have a second?

19               THE COURT:  Sure.

20          (Brief pause.)

21               MR. MURPHY:  There's an additional adjustment,

22     Your Honor, because he's been at home detention for 17

23     months, but I'm sure that the Court knows the law on that

24     because that's probably been argued many times before you.

25     So he has been on home detention for the past -- is it 17

1   months?  How long were you?

2           THE DEFENDANT:  It's been a year.

3           MS. MANUELIAN:  I think the law is very clear,

4   Your Honor, in this circuit that that's not going to count.

5           MR. MURPHY:  I think it depends on the terms and

6   conditions of the detention order.  I also believe, Judge,

7   that as an officer of the court that the attorney general

8   has to compute that.  That's a decision for the attorney

9   general.

10          MS. MANUELIAN:  That's not something that the

11  Court takes into account, Your Honor, in terms of what the

12  ultimate sentence is going to be.

13          THE COURT:  Oh, he -- he's on home detention on

14  this charge?

15          MR. MURPHY:  Yes.

16          MS. MANUELIAN:  Yes.

17          THE COURT:  Yes.  No, I think you're certainly

18  right, that is a matter for the Bureau of Prisons or the

19  attorney general to do the computation.  I don't do that.

20          MR. MURPHY:  That's right, so I'm not arguing that

21  that's a departure.

22          THE COURT:  Yes, I don't do that but -- well,

23  that's still part of the overall picture, that's for sure.

24          MR. MURPHY:  Yes.

25          THE COURT:  Counsel, obviously all of this, Mr.

1    Skozilas and Ms. Manuelian, Mr. Murphy and I have all been

2    thinking out loud on the impact of the sentencing guidelines

3    in this regard.  In light of the broad thrust of the

4    criminal conspiracy charged in this case, I'm not in a

5    position to find that this was unrelated.  It falls in that

6    period, and under the circumstances just any rational

7    conclusion would be that any drug activity by Mr. Trader

8    during the period of the conspiracy was related to that

9    conspiracy.

10           So the concern we are wrestling with here is well

11   taken, and under the circumstances, as Mr. Skolizas has

12   pointed out to the Court, at the very least it reduces it

13   from Category II to Category I because it's all part of the

14   same.  He doesn't have a prior criminal history.  This is

15   part of this case.

16           And under these circumstances that gets it to 292

17   to 365, but, in addition, I am satisfied it's an appropriate

18   grounds for a departure to give Mr. Trader the benefit of

19   credit for the time he has actually served on this related

20   offense of 18 months.  So under these circumstances, it

21   looks to me like it gets down to 274 to 347.  Well, I guess

22   I would really appreciate you all doing the arithmetic and

23   checking.

24           MR. MURPHY:  Judge, your arithmetic is correct.

25           THE COURT:  I'm right?  In this day and age I'm

1    never sure if anybody can do it without a calculator

2    anymore.

3            MR. MURPHY:  Well, we're from the old school,

4    Judge, where we get spanked if we tried to use calculators.

5            THE COURT:  Uh-huh.  Well, even more, as I recall,

6    Mr. Murphy, you're from MIT so I would certainly defer to

7    any graduate of MIT to be able to check me out anyway.

8            Counsel, under all these circumstances and these

9    are always difficult matters to compute exactly what this

10   book means, but I am satisfied on the basis that I have just

11   stated that the level is offense level 40, Criminal History

12   Category Roman Numeral I, but I am prepared to give 18

13   months credit for the time already served on the related

14   State charge.  So, as we established, it's a range of 274 to

15   347.  I'll be glad to hear from counsel on this regard.  I

16   suspect, Mr. Murphy, you might as well address the whole

17   ball of wax so let me hear from the government first.

18           MS. MANUELIAN:  Well, Your Honor, I think I

19   already made my argument with respect to this.  I think, you

20   know, there is a range here that the Court has to work with,

21   and I think that the appropriate sentence is 292 months.  I

22   think that for a number of reasons.  This individual was

23   dealing in a significant amount of crack cocaine.  Even with

24   the revised guidelines as they stand, there has been a

25   recognition not only by the Sentencing Commission but by the

1    courts that crack cocaine is highly potent, it's highly

2    addictive, it results in extremely violent and dangerous

3    behavior, and Mr. Trader was dealing for a two-year period

4    in the Cambridge area.  You know, he had a prior conviction.

5    He was found to be in possession of crack cocaine, and I

6    think that there's got to be some recognition of the fact --

7    of what the nature of this conspiracy was and that this

8    individual was selling amounts of crack cocaine to people on

9    the street.

10           And I don't think that in this instance the Court

11    should automatically gravitate to 274 months because that's

12    the low end of the guidelines.  I think there has to be some

13    sort of reflection, an accounting by the Court, for the

14    nature of the conspiracy and the nature of the criminal

15    conduct in this case.  And 292 months is within the range,

16    giving Mr. Trader the benefit of the 18 month reduction.

17           And, also, I think the Court also has to recognize

18    that the community in which Mr. Trader was dealing for this

19    period of time was a small community in Cambridge.  And the

20    impact that that has on that community when somebody like

21    Mr. Trader sets up shop and sells crack cocaine to these

22    people is significant, probably far more significant than an

23    impact even though equally devastating would have if he were

24    operating in some place like New York City where there are

25    millions of people.  The community in Cambridge and on the

103

1    Eastern Shore --

2            THE COURT:  Ms. Manuelian, do you really think the

3    people of Cambridge would not be impressed by a 23 year

4    sentence?

5            MS. MANUELIAN:  Well, I don't think --

6            THE COURT:  I would think almost any citizen of

7    the United States would be impressed by a 23 year sentence.

8            MS. MANUELIAN:  Your Honor, perhaps they might be

9    but I don't know that that's the kind of --

10           THE COURT:  And it would really hit them in the

11   eye if it was 24 and a half instead?

12           MS. MANUELIAN:  Actually I think it's -- I may be

13   wrong in my calculations --

14           THE COURT:  Well, I may be wrong too but I think

15   it's somewhere in that --

16           MR. MURPHY:  No, you're right, it's 22 years and

17   10 months, I believe.

18           MS. MANUELIAN:  Right, there's a little under a

19   two year difference I think is what the difference would be.

20           THE COURT:  Yes, well, it's 18 months different.

21           MS. MANUELIAN:  Well, Your Honor, I don't know

22   that that's the basis upon which the Court should be making

23   its decision.

24           THE COURT:  No, I don't either.

25           MS. MANUELIAN:  Frankly, I would look for a higher

104

1    sentence.  I am trying to, I think, do what's fair for both

2    sides, and given the nature and sort of cutting this

3    somewhat in the middle.  Given the nature of this

4    conspiracy, given the impact it has on the community in the

5    Eastern Shore where crack cocaine is a horrible problem, I

6    think that there has to be some fairer application of the

7    guidelines than just what Mr. Murphy says this is going to

8    be a life sentence for my defendant.

9           Yes, it's a high sentence, it's a significant

10   sentence, but I think that there is adequate basis in this

11   record given the facts for the Court not to automatically

12   say, well, 22.3 years is enough, let's go with the low end

13   and we'll give the defendant the benefit of the doubt.  I

14   don't know that we should be giving the defendant the

15   benefit of the doubt in a case like this given the nature of

16   the conspiracy and the impact it has on the community of his

17   criminal conduct.

18           MR. MURPHY:  Judge --

19           THE COURT:  Yes.

20           MR. MURPHY:  -- there's another way to look at

21   this.

22           THE COURT:  Huh?

23           MR. MURPHY:  You know, Mr. Trader was prosecuted

24   in Cambridge on this one incident.  He did his time.  He

25   came out.  He was in the process of being a law abiding

1   citizen.  He was working.  He was not involved in drug

2   dealing activities.  And the government took it upon itself

3   to go back in time to hit him one more time as though he

4   hadn't learned his lesson and was in a position to become a

5   productive member of society.

6          So for the last 18 months or so while he has been

7   awaiting trial in this case he has been magnificent, and he

8   has increased his level of trust with Magistrate Rosenberg

9   such that he got greater and greater privileges while

10  awaiting trial.  And he got permission to go back into the

11  hauling business, which was his legitimate business as you

12  heard from the evidence in this case, he had a fleet of

13  trucks, and he has been operating those trucks honestly and

14  gainfully.  I think that the Court ought to go to the bottom

15  of the guidelines.

16         THE COURT:  Okay.  Mr. Trader, at this time I will

17  be glad to hear from you anything you want to tell me before

18  sentence is imposed.

19         THE DEFENDANT:  Yes.  In 1993, I came up for

20  parole in 1993, the second week of August.  I got a detainer

21  to come to Baltimore City.  I came to Baltimore City on a

22  Wednesday.  I met with the federal officer over there.  He

23  wanted me to work for the Federal Government and I told him

24  that I have done my time in prison and I don't feel like I

25  have to do anything for anybody else like this.  So he tells

1    me that -- they tell me that if I do not work for them, we

2    are going to -- if I do work for them, they'll drop the

3    charges on me.  I say, I don't have no charges.  Well, we've

4    got a charge for this and we've got a charge for conspiracy.

5    I say, I've never done anything like that.

6              The stuff they found in my truck was on the floor

7    and one was in my coat pocket, I was half high, so I went to

8    jail for that and I served the time for it.  I came back --

9    so, therefore, after I got home by -- after I was home they

10   came and got me.  They took me and put me back in jail.  I

11   stayed in jail for a week or something like that, and then I

12   went to VOA.  I stayed at VOA for two months, then I went

13   back and they sent me home.  The whole time I was home my

14   fiancee, she took care of me because I couldn't go out, I

15   couldn't work.  I didn't start working until March or

16   something like that.  I started working and started working

17   a little bit.  I started getting my business back together a

18   little bit.

19             When I came to court, the day of court Ms.

20   Manuelian told me, she say, well, if you plead to Shante

21   we'll give you 46 months, something like that, 46 months.

22   And like I told her, I said I did not sell Shante nothing

23   and I don't know what you are talking about these guys and

24   I'm not pleading guilty to this.  So, therefore, I don't

25   think because I went to court I don't feel like I should be

1    punished for my rights of going to court, but I feel like

2    I'm being punished for my right because I went to court.

3         Nobody found any crack.  They don't have me on no

4    wiretaps, don't have me associate, they only have a picture

5    of with me with these boys.  I don't have time for this.  I

6    have been running my business -- in 1991, I had a seafood

7    business and I had a trucking business.  I did not have

8    time.  I never met -- the only time I met Thomas Keene is

9    one time when I was coming out of the house next door he

10   said something to me and I got in my car and I left.  I know

11   Douglas McKnight's father, but he's never been to my house

12   in my life.  He never had done nothing for me.  I don't know

13   Moon as you say.  All I know is Brian Smith.  I know Brian

14   Smith through that he brought some equipment from me like

15   this but as far as the other thing, me and Hope been good

16   friends for the last 15 years.

17        Like Mr. Gurney tells the jury that I'm a snake.

18   I feel that I should get apologized from him because I'm not

19   no snake because nobody -- because I want to do right and I

20   don't want to work for the Federal Government I'm a snake,

21   but if I had worked for the Federal Government, what would I

22   have been then?  Everybody would have been happy like this.

23   I don't know what those guys are doing.  I just came out of

24   prison so they are going to put pressure on me to make me do

25   these things.

1            So I don't think it's right by giving me no 23

2       years or whatever because I haven't got any coke, I haven't

3       seen anybody get any coke, I don't even had no $200,000.

4       They checked my bank account.  The most I had in my bank

5       account was $50,000.  That's the most I had in my bank

6       account at one time.  So I don't know where they are getting

7       all of this -- I mean, people coming up here saying all of

8       these stories that were lies with no proof to it.  There's

9       no proof nowhere.  Nobody can prove that I've been with

10      those guys in no kind of way.  She said that he went to New

11      York for me.  He said he came around my house.  He has never

12      been around my house in my life.  They've never been to ride

13      with me, they've never been out to dinner with me or

14      nothing.  I can't see getting no 23 years for something I

15      had never done.  I don't think it's right.

16            THE COURT:  Okay.  Thank you, Mr. Trader.  Please

17      remain standing, if you will, sir.  It is the responsibility

18      of the Court at this time to impose sentence in this case,

19      and let me state, Mr. Trader, first of all, clearly you were

20      found guilty by the jury in this case.  The Court does not

21      disagree with that verdict, and, accordingly, that's why we

22      are here for sentencing today.

23            I don't have to tell you how seriously the

24      government regards these offenses.  Congress has written

25      these laws so that the sentences are extremely severe and

109

1 obviously you are going to be sentenced to a long term of

2 imprisonment.

3   Let me state for I have to determine within that

4 guideline range what that sentence ought to be.  We are

5 still permitted within this guideline range to consider the

6 reasons for determining upon a sentence.  First, as to

7 punishment, the Court is satisfied that anything in this

8 range will be severe punishment to you.  You will be up in

9 years before you are released from these.

10   As to special deterrence, the length of sentence

11 won't make much difference.  If there was ever anything that

12 will be a deterrence to you to ever engage in the drug

13 business again, the sentence anywhere within this guideline

14 range will act as that deterrence.

15   As to general deterrence to others so that they

16 don't do what you have done here, in my discussion with Ms.

17 Manuelian I indicated that it sounded to me like any

18 sentence at the low end of the guidelines would be a severe

19 deterrence to anybody else to avoid being in the situation

20 you are here today.

21   And as far as rehabilitation, a sentence of this

22 length means that rehabilitation really doesn't have much to

23 do with it.  So for all of these reasons, I see no reason to

24 do anything but to sentence at the low end of the guidelines

25 after the departures and adjustments because it is, indeed,

110

1    severe punishment in accordance with the laws of this nation

2    for what you have done.

3              It's adjudged that as to Count 1, the defendant is

4    hereby committed to the custody of the Bureau of Prisons for

5    imprisonment for a term of 274 months.  It's further

6    adjudged that the defendant shall serve a term of supervised

7    release of five years in addition to the term of

8    imprisonment.  While on supervised release, the defendant

9    shall not commit another federal, state or local crime,

10   shall comply with the standard conditions that have been

11   adopted by this Court, and shall comply with the following

12   additional condition, the defendant shall not possess a

13   firearm or a destructive device.

14             And it's further adjudged that defendant shall be

15   paid a special assessment to the United States in the amount

16   of $50.

17             Let me state for the record that no fine will be

18   imposed in this case because the Court is satisfied from a

19   review of the presentence report and an additional length of

20   sentence we're dealing with here that no fine can be

21   collected.

22             Mr. Trader, you have a right to appeal from this

23   sentence to the Court of Appeals for the Fourth Circuit.

24   This is matter you should discuss with Mr. Murphy promptly

25   because notice of appeals must be filed within 10 days.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

**UNITED STATES OF AMERICA**　　　　　*

　　　　　　　**v.**　　　　　　　*　　**Criminal No.  WEB-93-0368**

**NATHANIEL A. TRADER**

　　　　　　　　　　　*

　　　　　　*　*　*　*　*　*

**O R D E R**

Upon review of the updated status report filed by the Office of the Federal Public

Defender, it is this _____ day of _____, 2008, ordered by the United States District Court for

the District of Maryland that:

　　1)　　the Office of the Federal Public Defender shall file an updated status report within

sixty days.

　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　Catherine C. Blake
　　　　　　　　　　　　　　United States District Judge